The next case is No. 22-1165, Medytox, Inc. v. Galderma, S.A. Mr. Gupta? May it please the Court, Vishal Gupta for Medytox. Your Honors, the PTAB erred by considering 50% or greater as a range instead of a threshold, and that error infected the Board's analysis with respect to its new matter determinations, written description, and enablement. Okay, but so let me ask you a question. Suppose a competitor achieves 95%. Could you sue for infringement? Your Honor, that would fall within the scope of the claims, and this is the reason why. Okay, so how can you have a different construction for infringement and invalidity? Your Honor, it would not be a different construction. The evidence points in one way for the construction, and that's that 50% or greater is a threshold. I don't think you're answering my question. You say that if somebody achieves 95%, he's infringing, so it has to be within the scope of the claim, so the claim has to reach 95%. Yes, Your Honor, and this is the reason why, because any responder rate, in the context of these claims, any responder rate above 50% is essentially the same, so 52 in the context of these claims would be the same as 95, and the reason why is because a POSA would see 50% or greater as a test for greater length of effect. I don't understand what you're saying. How can it be that if it infringes at 95% that we don't consider that the claim encompasses 95% for invalidity purposes? Your Honor, the claim would encompass a responder rate of 95%, and the reason why is because of the threshold construction. It should not be construed as a range construction, and if I can just go into the reasons why. Well, maybe you could help us. What is the difference between the range and the threshold? 95% is within the scope either way, right? Well, Your Honor, this leads to— Yes, but the construction is still a threshold, and the reason why that matters is because a person with a martial skill in the art would look at 95 or 52, for example, as the same, as a demonstration of sustained clinical effect or greater length of effect in the context of these claims, and that's widely in the extrinsic evidence. It's widely used as a test for sustained clinical efficacy, and in the intrinsic evidence in the specification, 50% or greater is used as a test for sustained clinical efficacy, and so— Even if you're right, and I'm not sure what you mean by I oppose it would look at it the same, but even if you're right, how is that implicated by the claim construction dispute? What is actually in dispute between the two parties as to whether it's a threshold or a range? Well, Your Honor, I think this gets into the 112 analysis. The PTAB improperly was looking at whether the disclosures of the specification enable or describe very specific responder rates above 50% when it should have just been looking at whether sustained clinical efficacy was demonstrated or not. It's a yes-no test. But we're talking about claim construction. You're suggesting that it makes a difference whether it's a range or a threshold. We're suggesting to you it seems to make no difference at all because no matter what the specific point is above 50%, you believe that the competitors achieving that is infringement and is within the scope of the claims. So that means that for infringement, it goes up to 100. If it goes up to 100 for infringement, it has to go up to 100 for invalidity. What's the difference? Well, Your Honor, this is the difference, is that as a range, again, a POSA would look at both of those values as a demonstration of clinical efficacy, whether it's 100 or whether it's above 50. It doesn't seem to me to be a claim construction issue. That may be a different issue. There may be a relevant difference between a range and a threshold. But for purposes of claim construction, there's no difference. Well, Your Honor, respectfully, we do believe it's a claim construction issue that infected the downstream analysis on 112. And again, in the context of these specific claims, it's a demonstration or a test for clinical efficacy or greater length of effect. The claim was not directed to a range of specific responder rates. And so if I could direct you to the evidence with respect to claim construction, specifically, the claims don't recite to 100. They say 50% or greater. That's explicitly a threshold. That's how one of our skill in the art would use it. But further, the Glagow article at Appendix 61, which is cited within the specification, the specification discusses it and says that sustained clinical effect was observed by applying a threshold test of more than 50% of responders. So that's how this term is used in the specification. And then the extrinsic evidence is also in accord. There are various references that use greater than 50% as a threshold to determine sustained clinical efficacy. So, again, it should not be looked at as a constellation of specific responder rates, but rather as an on-off binary test as a demonstration of greater length of effect. That is how POSA would view the term. And so getting to the enablement and written description analyses, the board specifically erred by requiring possession and enablement of specific responder rates above 50%. It should have instead been focusing on whether any responder rates above 50% exist without emphasis on the magnitude, without regard to the magnitude. I guess I'm lost at just the common sense question. If 95% to take Judge Dyke's hypothetical, if it infringes, then don't you have to show you had possession of it to satisfy the written description? And don't you have to show that one of skill in the art could look at your patent and without undue experimentation achieve 95%? Sure, Your Honor. That's a good question. And what would support 95%, as an example, would be the disclosures that show efficacy greater than 50%. And the reason why is because it's an on-off switch. When greater length of effect is demonstrated by the robust clinical trials. That's not complete construction. That's a different issue. Your Honor, with respect to support of written description and enablement, that's a question of whether there's enough support in the specification. And the specification here is rife with support. And you don't have to look at... I mean, do you believe this is an unpredictable art? When you have the guidance, the rife guidance of the specification, which has robust clinical trials, which discloses the concentrations of the different formulation ingredients, which has an example formulation, MT-1019... There's a lot of testimony here. It's unpredictable. Your Honor... And you'd have to run clinical trials to figure out whether a particular compound or whatever it is would achieve greater than 50%. Your Honor, with the guidance of the spec, it's not unpredictable. And secondly, any testing that would have to be taken would be routine. Why is it not unpredictable under the spec? Well, Your Honor, the reason why it's not unpredictable is because Meditox disclosed exactly how to get to the narrow circumscribed claims here. And it tells you exactly how to run a clinical trial. It tells you the formulation ingredients. It tells you the active ingredient type. It tells you add polysorbate. It says add a stabilizer. It also... You mean if the specification tells you how to run a test, it doesn't make any difference whether you can predict the test results in advance or not? Your Honor, any testing that would have to occur would be routine in view of the specification. Might be routine. The testing methodology might be routine, but the predictability is absent. You can't figure out which products are going to achieve the 95% under the MIHAC claim. Well, Your Honor, specifically in this case, as discussed on page 39 of our brief, that gives enough guidance for POSA to make formulations that would fall within the scope of these narrow circumscribed methods of treatment. It gives the ingredients and their amounts, the compositions. It even discloses MT-10109L at appendix page 61, which specific ingredients and amounts. And Meditox's expert, Dr. Singh, testified at appendix 4259-60 and 4266 that a POSA would expect similar variations of MT-10109L to work in the claim method of treatment after becoming aware of the disclosure of the 728 patent. In any event, based on... The board found otherwise, right? The board credited their expert and not yours. And we review that as substantial evidence, do we not? Well, Your Honor, that's not substantial evidence, and that's why the board erred. The body of evidence points in one direction of sufficient support. And the reason why is because there are robust clinical trial disclosures, and there are also robust formulation disclosures here. How do we just decide their expert? I think it was Dr. Singh. But whoever their expert was and the board's crediting of their expert, we can't just ignore that, can we? Your Honor, respectfully, there wasn't substantial evidence for the board's determination, and the court should follow its decisions in Allergan and Alcon here. Those are very instructive. In those specific cases, Your Honor, the board held adequate written description and enablement based on far less disclosure. If I could just briefly go over Allergan, for example, the claims there involved a composition that lowers interocular pressure with less hyperemia as compared to a second composition. And it was unbounded in terms of the amount of hyperemia that was lessened. In other words, the clinical effect was either achieved or it wasn't, just like here, and the claims were held to be adequately described despite no clinical data. Similarly, in Alcon, claims directed to enhancing chemical stability without an upper limit by adding a certain stabilizer were held to be adequately described despite no data in the specification on chemical stability. And as this court has noted, working examples of every embodiment are not required. When did you make your claim construction arguments before the board? It seems to me that your case rests on claim construction, and you're arguing here. No, I'm not arguing claim construction, but it seems to me that you are. You're making claim construction arguments that I don't think you made before the board. Am I correct? Your Honor, claim construction is still a dispute. We're saying that it's a range. We made those arguments before. We consistently argued below that a threshold construction should be used for 50% or greater. Did you argue that it's a range, or did you argue simply that the claim term should be given the plain and ordinary meaning?  and specifically not a range. So that's present at the Singh Declaration Appendix 2802-2805, and also Appendix 4256-57. That argument was presented before the PTAB at oral hearing, and the director review motion also raised that specific issue. And so the claim construction here is important because that is how one of our schools of the art would view the claim term. And then similarly, that interpretation would then be taken into how the guidance of the specification would be interpreted. And there are multiple responder rates above 50%, which would support the full scope of the threshold limitation. And one last point that I'd like to make before sitting down, this is not a claim the world scenario. If you look at the first page of the brief, Romanet 1, which details the claim, there are many limitations here. This is a specific circumscribed claim for a method of treating glabellar lines using specific formulation and specific amounts, specific ingredients. Then it outlines a specific test in terms of how to carry out a comparison. These claims have continually been narrowed during the PGR proceedings, so there was no introduction of new matter. And these claims are circumscribed in nature, which highlights how robust the written description and specification support is for the claims at issue. Okay. You want to save the rest of your time? Yes, thank you. We'll give you two minutes. Thank you. Mr. Jordan. Good morning. May it please the Court. Joe Mahoney on behalf of Calderma. And I'll start with addressing first Matty Talks' counsel's argument about You're Mr. Mahoney, right? Yes. Joe Mahoney. Pleasure to be here. So the on-off switch. Okay. The yes or no test. Their substitute claim 19, according to its express words, it has two requirements. One is that the animal protein-free composition has a greater length of effect compared to Botox 20 units. And then the second part is that that animal-free composition has a responder rate at 16 weeks of 50% or greater. But if you look at their construction under their yes or no median construction, what about an instance where Botox 20 units has the claimed responder rate that's higher than 50%? There's literature that shows that that actually happens. The Wu paper that we cite to in Appendix 2546. What's the point that you're making? Well, what I'm trying to point out is if it's yes or no, and if both the animal protein-free and the Botox exceed this 50% or greater, that makes no sense. There's no way to differentiate the two to see which one of those lasts longer. And that's why a range makes sense. In other words, I think what they're... Well, no, not based on what they've said. What their expert said was that 70%, 80%, 90%. It's not a question of what the expert said. It's a question of what the patent says, what the claims say. And they admit that for infringement, they can sue up to a hundred people. Right. That's right, and we agree. We think that that 50% or greater goes between 50% and 100%, and 100% is the inherent upper limit of the responder rate. So what, if anything, turns on the claim construction dispute? I'm sorry, your honor? What, if anything, turns on the claim construction dispute that's before us? Well, nothing, because whether it's a threshold or a range, you still, for the purposes of written description, you have to show possession for the full scope of the claim, so between 50% and 100%. And your argument is the same whether we go with their construction or yours. Is that right? Well, in terms of requiring, that claim would require, for the purposes of 112 written description, possession of the full scope of the claim. So they've only shown with two examples, 52% and 62%. They've not shown possession of compositions that exceed that, and therefore that's why there's no written description. But if I say it's a threshold, is your argument any different? Do you win under their construction? Well, as long as that threshold means from 50% to 100%, we do. Then there isn't a difference. Okay. And I want to address, yes, it is an unpredictable art, certainly. The patent talks about botulinum A toxin compositions. That's very broad because it's a protein. It may exist in many different forms. These botulinum A complexes have molecular weights of 900, 500, 300 kilodaltons. That's at appendix 54. And what that means is all these different type A toxins, they have different molecular weights. They have different activities, different doses, different efficacy, different duration, different immunogenicity. And that's why they all have different names. Otox is onobotulinum toxin. Dysport is abobotulinum. There are all these different names, and it's due to the variations in the proteins, due to the different manufacturing processes, different purification, different formulations. What's the point? All this is very unpredictable art. Okay. Very unpredictable art. And these type A toxins are not interchangeable. To that point, our expert, Dr. Ash Ramzan, he opined to the unpredictability and the undue experimentation on the enablement side. But significantly, Meditox's expert, Dr. Singh, said that it's impossible to speculate whether new formulations would meet the 50% or greater limitation. And on, Judge Raymond, your question about whether the claim construction arguments were made before the board, we acknowledge that Meditox, they did say to the board that 50% or greater was a threshold. But they didn't cite to any intrinsic evidence to support that. Okay. And so, for example, their argument as to the patent's reference to Glogau, that's new. That's a new argument for the purpose of this appeal. But that argument doesn't, that point about the Glogau reference, which is at column 22 of the patent, that doesn't save Meditox. I mean, the whole point of Glogau's reference in the patent, why it was cited, was to simply point out that larger, longer studies are necessary to confirm Meditox's result. But the construction was requested, the argument was made, and the intrinsic evidence didn't change, right? The intrinsic evidence was in the record. You're just faulting them for not pointing to certain parts of that intrinsic evidence? Correct. But that Glogau reference, it's about Botox, and how in the Glogau study, the responder rate for Botox was greater than 50%, and that was at odds with Meditox's study. But the Glogau reference, it's not talking about a threshold test. It's, as claimed here, it doesn't involve an animal protein-free composition or any comparison with any other botulinum toxins. And so, unless there's any further questions. Can I just ask you, your counsel for Meditox repeatedly said that a person's skill in the art review, 52% efficacy, the same as 95%, essentially. Is there evidence in the record to support that? No. No, there's not. They only studied specific compositions where they got 52% and a 62%, and that was it. And there's no evidence that any other composition would be better than that. Right, but what I probably wasn't clear, is there evidence as to whether a person of skill in the art would see all those different formulations essentially as the same? You know, if you could do 95%, you could do 85%, you could do 62%. The argument seems to be a person of skill in the art would see those all as the same thing. Is there evidence for that proposition? There's no evidence for that. And in fact, our expert, Dr. Ramzan, says the opposite. She would not see that. That there's no structure-function relationship established by their specific formulations where they found 52% and 62%. And you can't extrapolate that to any other botulinum toxin. So for example, there's ABO botulinum toxin, the Asher reference, where it's an animal protein-free composition, so it meets the limitations of the claim, except the responder rate was below 50%. So it didn't work. In your view, what's the scope that is captured by the written description? In the upper limit terms, is it 62%? Well, I'm saying that's the only examples that they have are a 52% and a 62%, but those are for specific formulations they have. The claim is broader than that. As I was saying, the claim is to a type A botulinum toxin where even the data that they got is only specific to a single one of those type A's. Would you agree that there's written description support and enablement for 50% to 62%? No, I do not agree with that. Why not? Because, again, because the different botulinum type A toxins, they all work differently, they have different molecular weights, different potencies, and all of that, you can't even say that any other would work. And in fact, as I was mentioning, that Asher 2018... There's written description support and enablement? I don't know where that argument carries. Well, I'm saying what they've claimed is far more than what they invented. They're not claiming the specific formulations that they studied and that they achieved those amounts. They're claiming all type A toxins with any polysorbate, any stabilizer, and they haven't possessed that. Okay. All right. Thank you. Mr. McBride. Good morning, Your Honors. May it please the Court. I represent Intervenor, the United States... Do you agree that there's no written description support or enablement for 50% to 62%? I don't have an opinion on that particular question. It wasn't addressed by the PTO in our brief. What's your view? On whether there's written description support for 52% to 62%. Yeah. I don't have a view to express on behalf of the agency on that particular issue. I think here the Board found that under the construction of the range as 50% to 100%, there wasn't written description support. It'd be a different question about that narrower range. Okay. Is the question here one of enablement or written description? Or does it matter? Well, I think they're both requirements. And the Board found here that under that construction of the 50% or greater limitation as a range of 50% to 100%, there was both a lack of written description and lack of enablement. The Board went through the WANs analysis factors and found that there basically wasn't any disclosure of how to make and use that range of responder rates having 80% to 100%. Does a written description disclose a range up to 62%? A responder rate of 62%? I mean, I believe there's three examples in the specification that have responder rates of 52%, 61%, and 62%. I'm talking about 62%. My understanding is there was a disclosure of one formulation that had a response rate of 62%, I believe so. So that's not a problem in your view? I mean, if there was a claim just claiming that formulation having a response rate of 62%, it seems like they had described that. Can I ask you about one of the APA arguments? The Board seems to have changed its mind on claim construction and new matter between the preliminary guidance and the final decision. If we say that that's okay, wouldn't that raise a concern about whether there's any use to this preliminary guidance if the Board can just change its mind after the patentee relies on it? Yeah. Well, I mean, the preliminary guidance was designed to be an initial discussion of whether the patent owner has shown there's a reasonable likelihood that the proposed motion to amend meets the statutory and regulatory requirements. And at the final written decision stage, based on a preponderance of the evidence and the notice in the Federal Register before this pilot program began, said that it was going to be a preliminary, initial, non-binding view of the Board. Is there really any value to the preliminary guidance then? There is, actually. I actually found some statistics summarizing the grant rate of motions to amend before the pilot program and after the pilot program was instituted. And it shows that 84% of patent owners that file motions to amend request preliminary guidance. And then in response to that preliminary guidance, 49% of patent owners file a revised motion to amend. Well, all you need is just one instance to offset those statistics. This may be it. Is there no integrity to a preliminary guidance? Is there no structural integrity? I think there needs to be integrity. And here, in this case, I think the Board was simply following the evidence as it came in. I mean, the patent owner argued that... The preliminary guidance suggests that they're going to potentially change their minds, right? Right. But the key there is that it provides the patent owner with an opportunity to respond by filing a revised motion to amend, providing additional evidence or arguments, which was done in this case. And if you look at the statistics... Their argument is they were denied that opportunity. I don't think they were denied any opportunity in this case because, first of all, the preliminary guidance is an optional program. You have to request it. If you're not happy with the chance that the preliminary guidance may change, you don't have to request that they give preliminary guidance. And in this case, it provided more process and more opportunities to be heard. Meditox was able to provide a revised motion to amend, provide additional evidence. Their expert provided additional evidence. Their counsel was able to make additional arguments. So there was more process here, not less. And I don't think it was arbitrary. Is it fair after all that process there's a provision of argument and provision of evidence to respond to adopt a different path? Yeah, a different path. I mean, if it's supported by the evidence as it came in, in this case, you know, after the board had issued its preliminary guidance that it was a threshold, appellant's argument... I'm sorry, appellant's expert, Dr. Singh, conceded at his deposition that that threshold actually encompassed under rates of 70%, 80%, 90% and appellant's counsel at the oral hearing seemed to say that the upper limit was 100% and the range or the threshold was really, in all practical aspects, the same as a range. And I think based with that evidence and those arguments, the board made a reasonable decision to change its mind. And this court has actually encouraged the board in FanDuel, for example, if it's convinced that its initial decision was incorrect based on the record, it should change its mind on issues if it thinks it was incorrect, and that's what happened here. So I don't think there's any due process violations. Okay, thank you. Thank you. Mr. Gupta, you have two minutes. Thank you, Your Honors. I just wanted to raise a few points. Starting with Mr. Mahoney's argument, as to Glagau, that's always been in the intrinsic record and in the briefing and even in the argument, they don't dispute that Glagau uses 50% as a threshold to do their analysis. And as to some other specific issues that he raised where 50% doesn't make sense in the context of the claims, Dr. Singh addressed that at Appendix 2815-16, that the analyzed rates in Glagau were actually less than 50%. Another point that I'd like to make is under either construction, the Allergan and Alcon cases control, because there's right guidance in the specification related to making animal protein-free compositions that fall within the scope of these claims. In response to the variables that Galderma raised, there's sufficient guidance in the spec, as I pointed out in my opening argument. And as this Court has held, you don't have to disclose 100% of the working examples. The Bayer case says that, the Alcon case says that, the Allergan case says that. With respect to the functional claim, structure function claim issue that... You don't have to have working examples, but there has to be some communication that you're in possession of. I mean, take NOVO, for example. Sure, there has to be some communication, and here we have more than ample support for the narrow claims at issue here. We have the animal protein-free compositions, their ingredients, their ratios, as well as all of the other additional method of treatment limitations. We are disclosing robust advanced clinical trials in this patent specification. What is the evidence in the record that a person of skill in the art would see the 52% and the 95% embodiments as the same thing? There's replete testimony regarding the threshold element, and that the clinical trials sufficiently support the full scope of the threshold range as claimed. Wait, what clinical trials? There were no clinical trials between 62 and 100, right? Well, Your Honor, again, the clinical trials that are disclosed, that disclose 52, 61, and 62, they would support the whole range, and the reason why is because the greater length of effect is demonstrated by those specific clinical trials. Does your expert say 52, 62, and 95 are all the same thing to a person of skill in the art? Yeah, Dr. Singh says that within the context of his overall testimony at the lower court. Can you give me an idea of where I would find that? Yes, Your Honor. Sorry, if you could just give me one second. It's at the 3rd Singh Declaration Appendix 4256-57. There, Dr. Singh is testifying about 50% being... Hold on a second. 4256, okay. There, Dr. Singh, that's just one example, but there, Dr. Singh is talking about how 50% is a clinically meaningful threshold. Tell us what language you're relying on, where it is. I'm just, I'm basically relying on the testimony where he said that 50% is a clinically meaningful, is a clinically meaningful threshold. Just because it's clinically meaningful doesn't mean that a person of skill in the art would see an embodiment that's 100% effective the same as one that's only 52% effective, does it? Those seem like different things. Well, that's why the threshold construction is important, Your Honor, because both of these values would be the same in the context of these claims. But it's that point that I'm not seeing the evidence for. You've insisted repeatedly that a person of skill in the art would see them as the same. I get that that's your argument, but where's the evidence for that? Your Honor, it's the intrinsic evidence as well as all the testimony related to the threshold limitation. And the threshold limitation disclosing the wide range of responder rates. Once you have responder rates above a certain amount, above 50, that to a POSA would enable the full scope. But even under the ALCON and Allergan claims which had less disclosure, to hold otherwise here would be inconsistent with those decisions. Also, there's something called the Kaplan-Meier test that's within the context of the intrinsic evidence that we cited. For example, the Bertucci reference, and that's in the briefing. And that also shows how 50% is a threshold. Okay, I think we're about out of time. Unless my colleagues have questions. May I just make one more point related to the EPA? I think we're done. Thank you, Mr. Cuffley.